## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **WILLIAM GORDON GIES,** | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | **Civil Action No. 3:18-CV-2700-L-BH** |
| | § | |
| **COMMISSIONER, SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge**[1] |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION

William Gordon Gies (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for supplemental security income (SSI) under Title XVI of the Social Security Act. (*See* docs. 1, 14.) Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **REVERSED**, and the case **REMANDED** for reconsideration.

### I. BACKGROUND[2]

On April 4, 2014, Plaintiff filed his application for SSI, alleging disability beginning on May 23, 2014. (doc. 11-1 at 14, 314.) His claim was denied initially on October 3, 2014 (*id.* at 117), and upon reconsideration on April 24, 2015 (*id.*). On May 7, 2015, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (*Id.*) He appeared and testified at a hearing on April 27, 2016. (*Id.*) On July 18, 2016, the ALJ issued a decision finding him not disabled. (*Id.* at 117-131.)

Plaintiff appealed the ALJ's decision to the Appeals Council, and on August 16, 2017, it remanded the case because the ALJ found a severe mental impairment at step two in the sequential

---

[1] By *Special Order No. 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

evaluation but did not include any limitations in the residual functional capacity (RFC) assessment. (*Id*. at 135-37.)  The Appeals Council directed the ALJ assigned to the case to assess mental RFC limitations on remand.  (*Id.* at 136.)

On remand, Plaintiff appeared and testified at a hearing before a different ALJ on April 11, 2018. (*Id.* at 14.)  On May 24, 2018, the ALJ issued a decision finding him not disabled.  (*Id.* at 14-24.)  Plaintiff timely appealed the ALJ's decision to the Appeals Council.  (*Id.* at 5-7.)  The Appeals Council denied his request for review on August 14, 2018, making the ALJ's decision the final decision of the Commissioner.  (*Id.*)  Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

### A.    Age, Education, and Work Experience

Plaintiff was born on April 19, 1967, and was 47 years old on the date of his application. (doc. 11-1 at 22.)  He had two years of college and training at a vocational trade school.  (*Id.* at 35.)  He had past relevant work as a landscape laborer and motel maintenance. (*Id.* at 22.)

### B.    Medical, Psychological, and Psychiatric Evidence[3]

On March 13, 2014, Plaintiff was seen during a homeless outreach visit by Parkland Health & Hospital System Physician Assistant Shakira Johnson for diarrhea and hypertension medication refill.  (*Id.* at 421.)  He reported that he had been out of his medicine for more than two years but did not want to start it back at that time.  (*Id.* at 422, 424.)  On March 20, 2014, he presented for review of his lab work and evaluation. (*Id.* at 433.)   He had no complaints at that time.  (*Id.*)

On June 2, 2014, he was seen at Parkland for low back pain with right side radiation caused by doing landscaping four days earlier.  (*Id.* at 438.)  His right leg was tingling, but he did not have

---

[3]Because this appeal is resolved on the first issue, i.e., whether the ALJ failed to properly evaluate his tuberculosis, only the medical evidence addressing Plaintiff's physical conditions is discussed.

dizziness, weakness, light-headedness, numbness, headaches, or paresthesias.  (*Id.* at 440.)  He was given pain medicine.  (*Id.*)

On June 10, 2014, Plaintiff was seen at Parkland for abdominal pain, vomiting, and diarrhea that had been bloody.  (*Id.* at 446.)  He had been having right upper quadrant abdominal pain for about two weeks, but denied injury or trauma to the area.  (*Id.*)  He was diagnosed with hypertension, tobacco use disorder, and hyperlipidemia (*Id.* at 447.)  An ultrasound of the right upper quadrant was unremarkable.  (*Id.* at 449.)  He was diagnosed with back pain, gastroenteritis (mild), rib pain on the right side, and gastroesophageal reflux disease (GERD).  (*Id.* at 454.)  On July 7, 2014, Plaintiff was evaluated for abdominal pain, and his problems were noted as hearing loss, shoulder pain, hypertension, tobacco use disorder, homelessness, and hyperlipidemia.  (*Id.* at 458, 464.)

On July 23-24, 2014, he was admitted to Parkland, presenting with a four-day history of epigastric abdominal pain and a small amount of blood on the toilet paper after bowel movements.  (*Id.* at 466-67.)  He had nausea with vomiting and reported losing twenty-five pounds.  (*Id.* at 467-68.)  His records showed that he had slightly gained weight, however.  (*Id.*)  He had experienced intermittent chest pains for years and reported constant abdominal pain that worsened with food and was not improved with TUMS, naproxen, or over-the-counter medications.  (*Id.*)

On July 25, 2014, Plaintiff presented for medication refill of Lisinopril/Hydrochloratiazide.  (*Id.* at 414.)  He had been out of his medicine for three days.  (*Id.*)  He denied being in pain, and he denied chest pain, dysnea, palpitations, rectal bleeding, or abdominal pain.  (*Id.*)  He was seen in the emergency department on July 23, and at that time, he had an extensive work up, including an abdominal ultrasound.  (*Id.*)  His results were all determined to be within normal limits.  (*Id.*)  He

reported that he was told to stop Rantidine and begin Prilosec. (*Id.*) He was diagnosed with hypertension, tobacco use disorder (½ pack of cigarettes a day for 30 years), hyperlipidemia, and GERD. (*Id.* at 414-15.)

On January 23, 2015, Plaintiff had radiology exams on his left shoulder and left clavicle at Parkland. (*Id.* at 524.) No acute fractures were noted, but the left clavicle film revealed an old injury. (*Id.*) The left shoulder films were not significantly changed from films done on May 23, 2011. (*Id.*) On February 3, 2015, he was seen for reports of experiencing intermittent left arm pain, which originated in his neck and traveled to the fingers in his left hand. (*Id.* at 586-87.)

On March 18, 2015, Plaintiff had an internal medicine consultative examination with Stella Nwankwo, M.D. (*Id.* at 508-513.) It was noted that he alleged disability due to his left shoulder and GERD. (*Id.* at 508.) He had not had any weight loss in six months, and he was actually gaining in his abdomen. (*Id.* at 509.) He had sharp left shoulder pain, but reported that his medicine took his pain from 8/10 to 4/10. (*Id.*) He ambulated with a cane at times, but did not bring it to the exam. (*Id.*) In an average month, he used his cane four days a week, inside the house 0% of the time, and outside the house 70-75% of the time. (*Id.*) Without his cane, he could walk only four blocks. (*Id.*) He could climb three flights of stairs, sit for one hour without changing positions, and stand for two hours once standing. (*Id.*) He could dress/undress himself but sometimes experienced pain in his left shoulder, and he could only write 1/4 of a page before his hands started cramping. (*Id.*) On average, he could lift only one pound due to shoulder pain. (*Id.*) Dr. Nwankwo diagnosed Plaintiff with hypertension, probable ascites, chronic liver disease, left shoulder pain, peripheral vascular disease, myofascial spasm, refractory error, dizziness, tremors with outstretched hands, and a heart murmur. (*Id.* at 512-13.)

4

On March 26 2015, Plaintiff was seen for arm pain and left shoulder pain, which felt like it was worsening. (*Id. at* 589.) He requested a pain medication adjustment, and it was determined that he had left shoulder pain, cervicalgia, and hypertension. (*Id.* at 589, 591.) Films of his cervical spine showed flexion to be mildly limited, but he had no fractures or dislocations. (*Id.* at 524.)

During an evaluation on April 3, 2015, it was noted that he was due for vaccines but declined to have them. (*Id.* at 592.) He was still suffering with left shoulder pain. (*Id.* at 594.)

On April 21, 2015, Plaintiff had an opthalmological/optometric consultative examination with James Gray, M.D. (*Id.* at 514-515.) Dr. Gray recommended glasses and concluded that Plaintiff's prognosis was good. (*Id.* at 515.)

On May 6, 2015, Plaintiff was seen for pain medication refills and reported that his "acid reflux" was not improved by over-the-counter medications. (*Id.* at 595.)

On May 7, 2015, he had an MRI of his left shoulder, which revealed mild rotator cuff tendinopathy and severe acromioclavicular osteoarthritis with posttraumatic deformity. (*Id.* at 525-26.) On July 8, 2015, he presented with continued shoulder pain and reported that he hurt his shoulder playing football in 1992. (*Id.* at 598.) He also reported that he had previously tried physical therapy, and it only made the situation worse. (*Id.*) He agreed to see a dietician to address his hyperlipidemia. (*Id.*)

On July 9, 2015, Plaintiff saw a registered dietician. (*Id.* at 603.) On August 6, 2015, he was seen for trouble with bowel movements, difficulty urinating, and low blood pressure. (*Id.* at 604.) On exam, he had mild diffuse tenderness, but there was no evidence of a urinary tract infection. (*Id.* at 606.) He was given medicine for constipation. (*Id.*) On August 19, 2015, Plaintiff was evaluated for constipation that had improved, but he was nauseated. (*Id. at* 607, 609.) He was directed to

5

increase his fiber and water intake to further help with the constipation. (*Id.* at 609.) He was diagnosed with constipation, hyperlipidemia, proteinuria, obesity, and tendinopathy of the left rotator cuff. (*Id.* at 609-10.)

On August 24, 2015, Plaintiff was seen and diagnosed with hyperlipidemia and proteinuria. (*Id.* at 612-13.) On September 1, 2015, he was seen for health maintenance, and it was determined that his immunizations were up-to-date. (*Id.* at 620.) His lab results revealed only slightly elevated creatinine and LDL, that were otherwise within normal limits. (*Id.*) He was directed to limit his naproxen use for the left rotator cuff disorder. (*Id.*)

On September 2, 2015, Plaintiff had an x-ray exam of his left shoulder. (*Id.* at 625.) It revealed fragmentation and offset at the acromioclavicular joint and degenerative changes of the glenohumeral and acromioclavicular joints. (*Id.*) The orthopedist found that he had arthritis of the left shoulder region and gave him an injection. (*Id.* at 631.)

On September 3, 2015, he reported that the cortisone injections had not helped his left shoulder. (*Id.* at 635.) He exhibited left shoulder pain on palpation and left range of motion. (*Id.* at 636.) He was diagnosed with late effects of sprain and strain without mention of tendon injury, elevated serum creatinine, and lack of housing. (*Id.* at 633.)

On September 22, 2015, it was determined that Plaintiff was due for vaccines, which he declined. (*Id.* at 638-40.) He was diagnosed with hypertension, left shoulder pain, hyperlipidemia, heartburn, and acute constipation. (*Id.* at 639.)

On October 20, 2015, he was again seen with a decreased range of motion in his left shoulder, but he had no tenderness, swelling, or deformity. (*Id.* at 644, 647.) It was noted that he had been given a steroid injection back in September, but it had worn off. (*Id.* at 648.) He was

diagnosed with an elevated serum creatinine and left tendinopathy of rotator cuff.  (*Id.* at 647.)

Plaintiff was seen again on November 4, 2015, and he presented with left shoulder pain, primarily focal tenderness directly over the acromioclavicular joint that interfered with his ability to sleep and work.  (*Id.* at 653-54.)  His rotator cuff strength was 5/5, and his radial pulse was 2+.  (*Id.* at 655.)  He was given an injection in the left acromioclavicular joint.  (*Id.*)  His primary diagnosis was acromioclavicular joint arthritis, and he was directed to return in three months.  (*Id.* at 654-55.)

On November 11, 2015, he presented for blood test results and agreed to go for a chest x-ray to follow up on a borderline T-spot result.  (*Id.* at 659.)  He complained of shoulder pain.  (*Id.* at 661.)  He was to get a chest x-ray to be screened for tuberculosis and return in a week.  (*Id.*)

On February 3, 2016, Plaintiff was seen again for left shoulder pain.  (*Id.* at 664.)  A week later, he was seen for left shoulder pain and declined vaccines.  (*Id.* at 666, 668.)  He was scheduled for left shoulder surgery on February 12, 2016.  (*Id.* at 669.)

On February 12, 2016, Plaintiff was seen in the ambulatory surgical center, where he had left acromioclavicular arthritis surgery performed by Katherine Coyner, M.D.  (*Id.* at 672, 674.)  He had chest x-rays, and the results did not exclude primary lung malignancy.  (*Id.* at 677-78.)  A CT of the chest was recommended, and he was discharged home.  (*Id.* at 674, 677-78.)

On March 2, 2016, he presented with an abnormal chest x-ray.  (*Id.* at 681.)  He was given a CT of the chest without IV contrast.  (*Id.* at 682.)  What appeared to be a neoplasm was discovered, and further evaluation was recommended.  (*Id.* at 683.)  On April 21, 2016, he was again evaluated.  (*Id.* at 691.)

On April 26, 2016, Plaintiff was seen by Thomas Chiu Hsienchang, M.D. in the Oncology

Lung Diagnostics Clinic. (*Id.* at 688-89.)  He was advised that a CT guided biopsy would be scheduled, and he would then return to the Oncology Lung Diagnostics Clinic for follow up. (*Id.* at 689.)

On July 22, 2016, he was seen for follow up, and it was noted that his thoracic surgery was scheduled for August 17, 2016. (*Id.* at 694-95.) He was hospitalized at Parkland Health & Hospital System from August 17, 2016 through August 25, 2016, for cardiovascular thoracic surgery. (*Id.* at 700.) He underwent a video-assisted thoracoscopy, wedge resection cervical mediastinal exploration with Scott Rezik, M.D. (*Id.* at 700, 712.) His lung mass was diagnosed as pulmonary tuberculosis, but no cancer was identified. (*Id.* at 703, 715.) He was advised on taking pain medication and antibiotics, Infectious Disease was consulted, RIPE[4] therapy was recommended, and he was told that Dallas Epidemiology would be following up with him. (*Id.*)

At a follow up on September 6, 2016, Plaintiff was found to be in no acute distress. (*Id.* at 714.) On September 27, 2016, he was seen to get medications refilled. (*Id.* at 722.) He also followed up on his treatment for GERD because he was experiencing gas pain following his surgery. (*Id.* at 723.) He was diagnosed with GERD and gas pain. (*Id.* at 725.)

On November 10, 2016, he presented for a dental problem and a wound check. (*Id.* at 728.) He was due for vaccines, but he declined to have them. (*Id.* at 729.)

On January 11, 2017, he was seen primarily for medication refills. (*Id.* at 734.) His surgical scar was found to be healing. (*Id.* at 736.)

On January 19, 2017, Plaintiff was seen by Khoa Dinh Tran, DDS at the Oral &

---

[4]RIPE refers to four different types of medications used to treat tuberculosis and mycobacterial infections and consists of: Rifampin, Rifabutin, or Rifapentine; Isoniazid; Pyraznamie; and Ethambutol. *Pree v. Colvin*, No. 3:11-CV-538-M, 2013 WL 5184016, at *6 (N.D. Tex. Sept. 13, 2013) (citing *Attorney's Textbook of Medicine* 3450-51 (3d Ed. LexisNexis, 2010)).

Maxillofacial Surgery Clinic.  (*Id.* at 738-39.)  Plaintiff reported that he had wisdom teeth extracted eight years prior, but they left a piece.  (*Id.* at 739.)  He agreed to return to the clinic for extraction of five teeth under local anesthesia.  (*Id.* at 743.)

On January 24, 2017, he was seen for a CT of the chest without IV contrast.  (*Id.* at 751.) It revealed a new 8 mm subpleural groundglass nodule; the other nodules were stable.  (*Id.*)  It was recommended that he follow up for a noncontrast chest CT in three months.  (*Id.*)

Plaintiff was seen again in the Oral & Maxillofacial Surgery Clinic for extractions on January 25, 2017.  (*Id.* at 758.)  He had fractured and grossly-decayed teeth.  (*Id.*)  Dr. Tran extracted two of the teeth under local anesthesia, and Plaintiff was to return for the extraction of three others.  (*Id.* at 760.)

On January 27, 2017, he presented with fever and dental pain.  (*Id.* at 764.)  He was due for vaccinations but declined to have them.  (*Id.* at 765.)  Mild edema was noted on the right side of his face, he was diagnosed with odontalgia, and he was prescribed Amoxicillin 500 mg.  (*Id.* at 767.)

On January 30,  2017, he was seen for postoperative follow up for his thoracic surgery.  (*Id.* at 768, 770, 774.)  It was noted that he had been diagnosed with tuberculosis, and that infectious disease had recommended RIPE therapy with outpatient follow up with Dallas County Epidemiology.  (*Id.* at 770.)  In August 2016, he began following up with Dallas County Epidemiology.  (*Id.*)  No carcinoma was identified, he had been asymptomtic for his tuberculosis, and he was compliant with RIPE therapy.  (*Id.* at 773-74.)  The plan was for him follow up with Dallas County Department of Health for a RIPE treatment completion date and surveillance.  (*Id.* at 774.)

On March 8, 2017, it was noted that Plaintiff had been taken off all his tuberculosis

medications, he had been released by Dallas County Health Department, and he was told he did not need any medication. (*Id.* at 775, 778, 780.) At that time, he was ready to proceed with left shoulder surgery. (*Id.* at 778.)

On March 23, 2017, Plaintiff presented for CT results and colon/prostrate cancer screening. (*Id.* at 783.) He was a smoker but did not wish to quit. (*Id.*)

On April 19, 2017, he was seen to discuss his pain medication. (*Id.* at 790.) He was evaluated on April 21, 2017, and had immunizations administered. (*Id.* at 792.)

On April 27, 2017, Plaintiff was seen by Minhaj M. Khan, M.D., for ongoing left shoulder pain. (*Id.* at 795.) He was diagnosed with tendinoathy of the left rotator cuff and multiple pulmonary nodules. (*Id.* at 794.) On April 19, 2017, he was evaluated for left shoulder issues. (*Id.* at 834.) Two days later, he had an MRI of his left shoulder without IV contrast. (*Id.* at 836.) The MRI revealed normal alignment. (*Id.*)

On May 1, 2017, Plaintiff had a CT of the chest with IV contrast. (*Id.* at 801.) The pulmonary nodules measuring 2 mm were stable. (*Id.* at 802.)

On August 10, 2017, he was seen, and his medications were refilled. (*Id.* at 800.) Smoking cessation was recommended. (*Id.*)

On May 8, 2017, Plaintiff was seen by Dr. Reznik for follow up regarding a pulmonary nodule. (*Id.* at 809.) It was noted that his thoracic surgery revealed no malignancy, but did confirm tuberculosis. (*Id.*) It was also noted that he received RIPE therapy on an outpatient basis from August 2016 through February 2017.[5] (*Id.*) He reported intermittent day/night diaphoresis and

---

[5] The record says the treatment ended in February 2016, but Plaintiff was not diagnosed with tuberculosis until August 2016. (doc. 11-1 at 809.)

chills but was otherwise asymptomatic. (*Id.*)

On May 10, 2017, he presented with a 2 cm dermalogical spot on his back. (*Id.* at 816, 818.) It was determined to be a sebaceous cyst. (*Id.* at 818.)

On May 11, 2017, Plaintiff was evaluated and diagnosed with tendinopathy of the left rotator cuff. (*Id.* at 820-21.) Weekly physical therapy was ordered for three months. (*Id.* at 821, 824.) On May 25, 2017, he was seen for left shoulder pain, given an orthopedic referral, and directed to continue physical therapy and his current regimen of analgesics. (*Id.* at 832-33, 843.)

On July 6, 2017, Plaintiff presented for evaluation with complaints of vomiting for two days, insomnia, and tobacco use disorder. (*Id.* at 846.) There was no hematemesis, but he had chills, cough, shortness of breath, chest pain, abdominal pain, constipation, diarrhea, and nausea. (*Id.* at 848-49.) He was given prescriptions for the vomiting and insomnia, as well as a referral for assistance with smoking cessation. (*Id.* at 850.)

On August 10, 2017, he was seen for medication refills. (*Id.* at 854.) He reported improvement with his nausea, vomiting, and abdominal pain. (*Id.*)

On August 30, 2017, Plaintiff was seen for hypertension, which was not well controlled. (*Id.* at 858, 860.) He reported taking his medicine consistently, but denied having a way to monitor his blood pressure between clinic visits. (*Id.* at 860.)

On September 28, 2017, he was evaluated for a rash on the buttocks and adenopathy. (*Id.* at 865, 868.) He was diagnosed with tinea corporis, essential hypertension, abnormal renal function, multiple pulmonary nodules, and tobacco use disorder. (*Id.* at 864.)

On September 29, 2017, Plaintiff was seen and diagnosed with abnormal renal function. (*Id.* at 871.) On October 11, 2017, he was seen for tinea corporis. (*Id.* at 875.) On November 28, 2017,

11

he was evaluated for complaints of right ankle pain caused by an injury to the right ankle, medication refills, and essential hypertension. (*Id.* at 881.)

On December 13, 2017, he was seen for hypertension, hypercholesterolemia, insomnia, complete tear of left rotator cuff, and acute right ankle pain (x-ray negative). (*Id.* at 897.) His ankle was not displaced, fractured, or dislocated and was reported to be improving. (*Id.* at 900.) Upon examination, he could not raise his arm past 90 degrees. (*Id.* at 902.) On January 18, 2018, Plaintiff was evaluated for health maintenance and elevated blood pressure, and he was diagnosed with hypertension. (*Id.* at 906-07.)

## C.    **Hearing**

On April 11, 2018, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (*Id.* at 55-94.) Plaintiff was represented at the hearing by an attorney. (*Id.* at 55.)

### 1.    **Plaintiff's Testimony**

Plaintiff appeared by phone because he was suffering with active tuberculosis infection. (*Id.* at 58.) He was living in a house with a friend until his health got better. (*Id.* at 63.) He was not receiving benefits or government assistance. (*Id.* at 63-64.) He was 5'9" tall and weighed 155 pounds, and had recently gained weight because he had started eating better. (*Id.* at 64.) His dominant hand was his right hand, and he had a driver's license but did not drive because he did not have a vehicle. (*Id.*) If he had a vehicle, he would have been limited to driving to and from doctor's appointments due to drowsiness from his medications. (*Id.* at 64-65.)

Plaintiff last worked in 2014, in landscaping. (*Id.* at 65.) He worked outside most of the time, lifted up to 100 pounds, and was on his feet 14 hours per day. (*Id.*) He left that job after he collapsed at work and stopped breathing, and he had not attempted to find work since. (*Id.*) He had

had muscle spasms and twitching, and when he had pain, he had to take a pain pill and then lie down. (*Id.* at 65-66.) Prior to 2014, he did not have any impairments, and in fact, everything came on rather suddenly. (*Id.*) He considered his lung cancer surgeries to be the number one reason he could not work. (*Id.*) His first lung cancer surgery was two years before the hearing, and there was talk of another surgery. (*Id.* at 66-67.)

His lung condition affected him severely on a day-to-day basis. (*Id.* at 67.) He could only walk 30 minutes at a time, and then he had to sit down and do breathing exercises for 3.5 to 4 hours. (*Id.*) He could lift two pounds with either arm, but could not reach over his head with either arm. (*Id.* at 67-68.) He was limited to sitting for an hour to an hour and a half at a time. (*Id.* at 68.) After sitting for that long, he had to rest. (*Id.*) He took medication for his lung issue, which was made worse by dust, allergens, and smoke. (*Id.* at 69.) Bending over was difficult for him because his muscles had not yet healed from the first surgery. (*Id.*)

Plaintiff had a dislocated rotator cuff on the left side, and first started having issues in 2014. (*Id.* at 70-71.) His shoulder had bothered him since he was young, but he shrugged off the pain and continue working. (*Id.* at 72.) He took pain medicine and had physical therapy, but it was not helpful at all. (*Id.* at 70.) He was scheduled to see an orthopedic surgeon for a surgery consultation. (*Id.* at 70-71.) He had never looked at a sit-down job because he did not believe he would be qualified. (*Id.* at 72.) At his hearing, his shoulder pain was at a ten on a scale of one to ten, which was normal for him. (*Id.* at 73.) His medication helped for only about two hours at a time. (*Id.*)

He had polyps in his colon. (*Id.* at 74.) Beginning in 2016, the polyps caused him to go to the bathroom approximately 40 times per day. (*Id.*) He had about four accidents a day, when he did not make it to the bathroom. (*Id.* at 75.) He also got dehydrated. (*Id.* at 75-76.)

Plaintiff had poor vision in both eyes. (*Id.* at 76.) It could be detached retinas, but he was not getting treatment at the time. (*Id.* at 76-77.) He also had trouble with bipolar disorder, depression, or anxiety. (*Id.* at 77.) He was taking mental health medication, which was very helpful to him, and he was compliant with those medications. (*Id.* at 78.) When he was not taking it, he would get angry. (*Id.*) He had been on the medicine for four years. (*Id.*)

His typical day involved walking his dogs for about ten minutes. (*Id.* at 79.) When dressing, he had issues putting on his shirt due to his shoulder problem. (*Id.*) He passed his time by playing video games. (*Id.*) Shortly after taking his medicine, he got drowsy, and then he had to lie down for three and a half to four hours. (*Id.*) He saw family members, such as his wife, but he only got out of the house for doctors' appointments. (*Id.* at 80.)

He had pain in both hands caused by nerve damage and pain in both knees. (*Id.* at 81.) He suffered with head pain, caused by a concussion, and rear end pain caused by his cancer, which was spreading. (*Id.* at 82.) He also had neck and back pain. (*Id.* at 83.) He could only sit about two hours and stand and walk only one hour in an eight-hour workday. (*Id.* at 83-84.) Otherwise, he needed to lie down. (*d.* at 84.) He could use his fingers to type on a keyboard for only 30 minutes of an eight-hour workday. (*Id.*) If hired for an eight-hour day, five-day a week sedentary job, he predicted he would be absent all five days of the week. (*Id.*)

### 2.    VE's Testimony

The VE testified that Plaintiff worked as a landscape laborer, SVP of 2, unskilled, heavy work. (*Id.* at 88.) He had also worked as motel maintenance, SVP of 7, skilled, and heavy work. (*Id.*)

The initial hypothetical involved an individual of Plaintiff's age, education, and work

experience.  (*Id.*)  The individual could perform medium work, except he could not reach overhead on the left.  (*Id.*)  The VE testified that the hypothetical individual could not perform any of Plaintiff's past jobs because both past jobs required lifting in excess of fifty pounds.  (*Id.*)  If Plaintiff could do medium work and was not precluded from performing those jobs where there was significant overhead lifting, he could work as a hand packager (900,00 jobs nationally), laundry worker (185,000 jobs nationally), and janitor (over one million jobs nationally).  (*Id.* at 88-89.)

Under a second hypothetical, the individual was limited to light work, except he was further limited to frequent reaching with the right upper extremity, occasional reaching with the left upper extremity, and no overhead reaching with the left upper extremity.  (*Id.* at 89.)  He was also limited to understanding, remembering, and carrying out simple and routine tasks and instructions.  (*Id.*)  He should not work at production pace rate.  (*Id.*)  Plaintiff's past work was totally eliminated.  (*Id.*)

With the third hypothetical, which was the same as the second hypothetical without the production rate limitations, he could work as a food inspector (43,000 jobs nationally), belt inspector (42,000 jobs nationally), and cloth inspector (17,000 jobs nationally).  (*Id.* at 90-91.)

Under a fourth hypothetical, if the hypothetical individual needed ten or more unscheduled breaks to go to the bathroom per workday, there would be no jobs available to him.  (*Id.* at 91.)  The VE's testimony was consistent with the Dictionary of Occupational Titles.  (*Id.*)

**D.**    **ALJ's Findings**

The ALJ issued a decision denying benefits on May 24, 2018.  (*Id.* at 14-24.)  At step one, he found that Plaintiff had not engaged in substantial gainful activity since August 4, 2014, the application date.  (*Id.* at 16.)  At step two, the ALJ found that Plaintiff had the following severe impairments: disorders of the muscle, ligament, and fascia (encompassing the back/neck/shoulder

pain), obesity, and affective disorder.  (*Id.*)  Despite those impairments, at step three, the ALJ found

that he had no impairment or combination of impairments that met or medically equaled the severity

of one of the listed impairments in the social security regulations. (*Id.* at 17.)

Next, the ALJ determined that Plaintiff retained the RFC to perform light work as defined

in 20 C.F.R. § 416.967(b), except he was limited to frequent reaching with the right upper extremity,

occasional reaching with the left upper extremity, and no overhead reaching with the left upper

extremity.  He was limited to understanding, remembering, and carrying out simple and routine tasks

and instructions.  (*Id.* at 19.)

At step four, the ALJ determined that Plaintiff was unable to perform his past work.  (*Id.* at

22.)   At step five, the ALJ found that transferability of job skills was not material to the

determination of disability because the Medical-Vocational Rules supported a finding that he was

not disabled whether or not he had transferable job skills, but considering his age, education, work

experience, and RFC, there were jobs that existed in significant numbers in the national economy

that he could perform.  (*Id.* at 22.)  Accordingly, the ALJ determined that Plaintiff had not been

under a disability, as defined by the Social Security Act, since August 4, 2014, the date the

application was filed. (*Id.* at 24.)

## II.  STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236

(5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a

scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a

reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.      An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.      An individual who does not have a "severe impairment" will not be found to be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.  ISSUES FOR REVIEW

Plaintiff presents three issues for review:

18

(1) The ALJ applied an improper legal standard to evaluate severe impairments. The Plaintiff has been prejudiced thereby, as the ALJ failed to consider the significance of all of the impairments established in this record, nor did the ALJ consider functional limitations based thereon. Did the ALJ properly consider all of the Plaintiff's vocationally significant impairments in determining his residual functional capacity (RFC)?

(2) The ALJ gave only partial weight to some medical opinions and little weight to other medical opinions of record. But the ALJ failed to indicate to what extent he agreed or disagreed with such medical opinions. Further, the ALJ provided no basis for his findings as to Plaintiff's residual functional capacity. The ALJ is not free to substitute his own medical judgment for that of the opinion evidence of record. Did the ALJ properly evaluate medical opinion evidence in reaching his RFC determination?

(3) Having found that the Plaintiff cannot return to his past relevant work, the burden shifted to the Commissioner to establish the existence of other work, in significant numbers, which the Plaintiff can perform. The ALJ attempted to satisfy this burden through testimony of a vocational witness (VE). But the witness identified jobs which are currently performed beyond the unskilled level, and the ALJ failed to identify any skills which the Plaintiff may have and which are transferable to such work. Did the Commissioner carry his burden of establishing the existence of work within Plaintiff's residual functional capacity that he could perform?

(doc. 14 at 2-3.)

## A.   Severity Standard

Plaintiff initially argues that when defining a severe impairment, the ALJ incorrectly stated the severity standard, and that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to consider all of his vocationally-significant impairments in determining his RFC.  (doc. 14 at 4.)  He contends that unlike the standard set forth by the ALJ, the standard in the Fifth Circuit does not allow for "minimal interference" with an individual's ability to work, and that it is irrelevant that the ALJ proceeded beyond step two.  (*Id.* at 5.)  The Commissioner does not dispute that the ALJ did not set forth the severity standard set forth in *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985), but argues that the ALJ "complied with the ruling of *Stone*" in light of the references to Social Security Rule (SSR) 85-28.  (doc. 15 at 3.)

At step two of the sequential evaluation process, the ALJ "must consider the medical severity of [the claimant's] impairments." 20 C.F.R. § 416.920(a)(4)(ii),(c). To comply with this regulation, the ALJ "must determine whether any identified impairments are 'severe' or 'not severe.'" *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 903 (5th Cir. 2010). Under the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). The Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Stone v. Heckler*, 752 F.2d 1099, 1101, 1104-05 (5th Cir. 1985). Accordingly, to meet the severity threshold at step two, "the claimant need only ... make a *de minimis* showing that [his] impairment is severe enough to interfere with [his] ability to do work." *Anthony*, 954 F.2d at 294 n.5 (citation omitted). Ultimately, a severity determination may not be "made without regard to the individual's ability to perform substantial gainful activity." *Stone*, 752 F.2d at 1104.

Here, at the outset of the decision, the ALJ stated that "[a]n impairment or combination of impairments is 'severe' within the meaning of the regulations if it more than minimally limits an individual's ability to perform basic work activities."  (doc. 11-1 at 15.)  He then noted that "[a]n impairment or combination of impairments is 'not severe' when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 416.922; Social Security Rulings (SSRs) 85-28 and 16-3p)."  (*Id.*)

*Stone* provides no allowance for a "minimal interference" with a claimant's ability to

work. *Stone*, 752 F.2d at 1104. Given the difference between these two constructions and the ALJ's failure to cite to *Stone*, it appears he applied an incorrect standard of severity. *See Garcia v. Astrue*, No. 3:08-CV-1881-BD, 2010 WL 304241, at *3 (N.D. Tex. Jan. 26, 2010) (explaining that courts in this district have consistently rejected, as inconsistent with *Stone*, the definition of severity under 20 C.F.R. § 416.920(c) that the ALJ cited in this case); *see also Lawson v. Astrue*, No. 4:11-CV-00426, 2013 WL 449298, at *4 (E.D. Tex. Feb. 6, 2013) (noting "while the difference between the two statements appears slight, it is clear that the [regulatory definition] is not an express statement of the *Stone* standard").  Moreover, contrary to the Commissioner's argument, the ALJ's reference to SSR 85-28 does not remedy the error because "[a]n ALJ's referral to the applicable social security regulations and rulings, including 20 C.F.R. § 416.920(c), 20 C.F.R. § 416.921, SSR 85-28, SSR 96-3p, and SSR 96-4p, does not substitute as a proper construction of the *Stone* standard." *Scott v. Comm'r of Soc. Sec. Admin.*, No. 3:11-CV-0152-BF, 2012 WL 1058120, at *7 (N.D. Tex. Mar. 29, 2012) (citing cases).

Even where the ALJ fails to specifically determine the severity of a claimant's impairments at step two, remand is not required where the ALJ proceeds to the remaining steps of the disability analysis and considers the alleged impairment's effects (or its symptoms) on the claimant's ability to work at those steps. *See, e.g., Herrera*, 406 F. App'x at 903 & n.2; *Abra v. Colvin*, No. 3:12-CV-1632-BN, 2013 WL 5178151, at *4 (N.D. Tex. Sept. 16, 2013) (listing cases). An ALJ's failure to apply the correct standard at step two in determining the severity of the claimant's impairments (i.e., *Stone* error) "does not mandate automatic reversal and remand, and application of harmless error analysis is appropriate [ ] where the ALJ proceeds past step two in the sequential evaluation process." *Gibbons v. Colvin*, No. 3:12-CV-0427-BH, 2013 WL

1293902, at *14 (N.D. Tex. Mar. 30, 2013) (citing cases).

In response to Plaintiff's argument that the ALJ did not properly evaluate the medical evidence relating to his tuberculosis as a result of the allegedly incorrect severity standard at step two, the Commissioner contends that the ALJ did properly assess the medical evidence pertaining to his tuberculosis.  (doc. 15 at 4.)  Relying on *Brunson v. Astrue*, 387 F. App'x 459 (5th Cir. 2010), the Commissioner argues that the Fifth Circuit has held that courts should consider statements by the ALJ that he has carefully reviewed the entire record to be true statements of his actions.  (doc. 15 at 4.)  In *Brunson*, the Fifth Circuit saw "no reason or evidence to dispute" the ALJ's statement of findings made expressly "[a]fter careful consideration of all the evidence."  387 F. App'x at 461.

Here, however, the ALJ's statement that he reviewed the entire record appears inconsistent with the evidence of record relating to Plaintiff's tuberculosis, a severe communicable disease.[6]  (doc. 11-1 at 58, 703, 715, 770, 773-74, 775, 778, 780, 809); *see also Gooden v. Haley*, No. CA 99-0611-CB-C, 2000 WL 206634, at *1 (S.D. Al. Feb. 14, 2000) (noting that tuberculosis is a communicable disease).  In February 2016, a lesion was discovered in Plaintiff's lung.  (doc. 11-1 at 683.)  On August 23, 2016, he had cardio-thoracic surgery, which revealed that he was suffering from tuberculosis.  (*Id.* at 703.)  He was advised at that time that Dallas Epidemiology would follow up with him, and he was put on an extensive medication

---

[6]Tuberculosis refers to a "disease caused by infection with *Mycobacterium tuberculosis,* the tubercle bacillus, which can affect almost any tissue or organ of the body, the most common site of the disease being the lungs." *Pree*, 2013 WL 5184016, at *2 n.3 (quoting *Stedman's Medical Dictionary* 2046 (28th ed. Lippincott Williams & Wilkins, 2006). "The symptoms of active pulmonary [tuberculosis] are fatigue, anorexia, weight loss, low-grade fever, night sweats, chronic cough, and hemoptysis." *Id.* (quoting *Stedman's* at 2046).  The risk of activating the disease "is increased by diabetes mellitus, malnutrition, HIV infection, ... [and] in patients with alcoholism." *Id.* (quoting *Stedman's* at 2046).

regimen that included both pain medicine and antibiotics.  (*Id.* at 703, 715.)  Plaintiff received

RIPE therapy on an outpatient basis from August 2016 through February 2017.  (*Id.* at 809.)  On

April 11, 2018, on the date scheduled for Plaintiff's hearing before the ALJ, he was suffering

with active[7] tuberculosis and could not appear in person.  (*Id.* at 58.)

       At step two, the ALJ found that Plaintiff had the following severe impairments: disorders

of muscle, ligament, and fascia (encompassing the back/neck/shoulder pain), obesity, and

affective disorder. (*Id.* at 16.)  He found non-severe impairments, including right foot problems,

eye impairment, and pulmonary nodules, and that the allegation of limitations related to bowel

incontinence or residual impact from a concussion were not medically determinable impairments

during the relevant time frame.  (*Id.*)  He also noted:

> Regarding the objective medial evidence since the last decision, I note that
> Parkland Hospital personnel reported that in August 2016, after treatment for a
> lung mass (video assisted thorascopy, wedge resection, and cervical mediastinal
> exploration), that the claimant had tuberculosis (Exhibits  11F/4, 12F/4).

(*Id.* at 17.) Because none of his impairments or a combination of impairments met or medically

equaled a listed impairment at step three, the ALJ proceeded to assess Plaintiff's RFC.  (*Id.*); *see*

*also* 20 C.F.R. § 416.920a(d)(3); *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001) ("If the

[claimant's] impairment is severe, but does not reach the level of a listed disorder, then the ALJ

must conduct a [RFC] assessment.").  While the ALJ proceeded past step two in the sequential

evaluation, he did not specifically address Plaintiff's tuberculosis or any functional limitations

resulting from it.  (*See* doc. 11-1 at 17-22.)

---

[7]Active tuberculosis is contagious.  *See Gooden v. Haley*, No. CA 99-0611-CB-C, 2000 WL 2066634, at *1
(S.D. Al. Feb. 14, 2000).

B.    **Harmless Error**

As a general rule, this Court "may only affirm an agency decision on the basis of the rationale it advanced below." *January v. Astrue*, 400 F. App'x 929, 932 (5th Cir. 2000) (per curiam). Harmless error is an exception to this general rule. *Id.* at 932-33. In the Fifth Circuit, harmless error exists when it is "inconceivable" that a different administrative determination would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)). Because "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party have been affected," Plaintiff must show he was prejudiced by the ALJ's *Stone* error. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam). To establish prejudice, Plaintiff must show that the ALJ's failure to apply the proper legal standard at step two casts doubt onto the existence of substantial evidence supporting his disability determination. *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) ("Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision.") (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).

Here, the ALJ's *Stone* error was not harmless. Although the ALJ proceeded beyond step two in the sequential evaluation, he made no mention of his tuberculosis or any work-related limitations arising therefrom, other than summarily mentioning the wedge resection surgery that ultimately revealed the diagnosis of tuberculosis. In *Pree v. Colvin*, No. 3:11-CV-3583-M (BH), 2013 WL 5184016, at *16 (N.D. Tex. Sept. 13, 2013), the court found that *Stone* error at step two was not harmless where the ALJ failed to specifically address the claimant's tuberculosis at

24

any step in the disability analysis and required remand. *See also Hall v. Astrue*, No. 3:11-CV-1929-BH, 2012 WL 4167637, at \*13 (N.D. Tex. Sept. 20, 2012) (holding that *Stone* error was not harmless and required remand where the ALJ failed to address or consider the effects of the claimant's chronic nasal congestion on his ability to work at any step of the sequential evaluation process). Likewise, the ALJ's error here is not harmless, and remand is required on this issue.[8]

## IV. RECOMMENDATION

The Commissioner's decision should be **REVERSED,** and the case **REMANDED** to the Commissioner for further proceedings.

**SO RECOMMENDED** on this 3rd day of March, 2020.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a copy of these findings, conclusions, and recommendation on all parties by mailing a copy to each of them. Pursuant to 28 U.S.C. § 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within fourteen days after being served with a copy. A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. Failure to file written objections to the proposed findings, conclusions, and recommendation within fourteen days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (*en banc*).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[8]Because the ALJ's use of the correct severity standard on remand will affect Plaintiff's remaining issues, they are not addressed.

25